UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ELIZABETH BIDWELL,                    :
                                      :CIVIL ACTION NO. 3:17-CV-29
          Plaintiff,                  :
                                      :(JUDGE CONABOY)
          v.                          :
                                      :
NANCY A. BERRYHILL,                   :
Acting Commissioner of                :
Social Security,                      :
                                      :
          Defendant.                  :
                                      :
_____

## MEMORANDUM

Pending before the Court is Plaintiff's appeal from the Acting Commissioner's denial of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. (Doc. 1.)  Plaintiff filed an application for benefits on September 26, 2012, alleging a disability onset date of April 19, 2008.  (R. 18.)  After she appealed the initial denial of the claim, Administrative Law Judge ("ALJ") Elizabeth Koennecke, presiding in Syracuse, New York, held a hearing on August 25, 2014, with Plaintiff and her attorney appearing in Binghamton, New York.  (R. 58.)  ALJ Koennecke held a supplemental hearing on December 2, 2014.  (R. 82.)  With her Decision of December 5, 2014, the ALJ denied benefits.  (R. 124-43.)  Plaintiff requested review of the Decision by the Appeals Council (R. 255-57) and the Appeals Council vacated the Decision and remanded the case for further proceedings on February 17, 2016 (R. 144-47).  The Appeals Council specifically directed further evaluation of Plaintiff's mental impairments, further consideration

of Plaintiff's maximum residual functional capacity ("RFC"), and vocational expert evidence if warranted.  (*See* R. 40.)

On August 22, 2016, ALJ Koennecke conducted another hearing (R. 95-107), and issued her second Decision denying benefits on August 30, 2016 (R. 40-52).  Plaintiff again requested review which was denied by the Appeals Council on November 18, 2016.  (R. 1-6, 35-36.) With the Appeals Council denial, the ALJ's August 30, 2016, decision became the decision of the Acting Commissioner.  (R. 1.)

Plaintiff filed this action on January 5, 2017.  (Doc. 1.)  In her supporting brief, Plaintiff asserts generally that the ALJ committed reversible error in finding there was insufficient evidence to establish Plaintiff could not engage in substantial gainful activity.  (Doc. 10 at 7.)  After referencing her hearing testimony, her written application, and her husband's Third Party Function Report, Plaintiff states that "[a]ny attempt by the Administrative Law Judge to discredit Ms. Bidwell's testimony as inconsistent falls short of the proper exercise of discretionary authority.  The Administrative Law Judge abused her discretionary authority."  (Doc. 10 at 8 (citing R. 374-381, 396-403.)  Plaintiff specifically avers that the ALJ's failure to find that she does not meet Listing 1.08 is reversible error (*id.* at 10), the ALJ's comments about Plaintiff's use of a cane were not consistent with the findings of treating and examining physicians (*id.* at 11-12), the ALJ demonstrated a predisposition to deny Plaintiff's

2

claim (*id.* at 12), and the ALJ's credibility findings are not supported by evidence of record (*id.*).  After careful review of the record and the parties' filings, the Court concludes this appeal is properly granted.

## I. Background

Plaintiff was born on June 4, 1978, and was thirty-five years old on September 30, 2013, the date last insured.  (R. 50.)  She has a high school education, an associate degree as a vascular technician, and past relevant work as a waitress, telemarketer, and supervisor.  (R. 50, 86.)  At the August 25, 2014, ALJ hearing, Plaintiff explained that she was studying for her vascular technician boards and working as a waitress in April 2008 when she sustained the electrical burn injury which is the basis of impairments at issue here.  (R. 63-64.)  Plaintiff claimed that the following conditions limited her ability to work: PTSD, RSD, depression, severe anxiety, and severe nerve damage due to electrocution in her left leg and hip.  (R. 362.)

### A. Medical Evidence[1]

After suffering the electrical burn at her house, Plaintiff was taken to Moses Taylor Hospital in Scranton, Pennsylvania, and transferred to the Lehigh Valley Hospital where she was admitted

---

[1] The evidence review focuses on citation to the record relied upon by the parties and the ALJ relevant to Plaintiff's claimed errors.  As these errors relate to Plaintiff's physical impairments, the Court will not review evidence related to claimed mental impairments.

for burn care on April 19, 2008.  (R. 451.)  The April 21, 2008, Discharge Summary indicates Plaintiff's hospital stay was uneventful and she was discharged to home with directions for wound care and Vicodin for pain control.  (*Id.*)  A follow-up appointment in the Burn Recovery Center was scheduled for April 25, 2008. (*Id.*)  At the April 25th visit, Plaintiff was directed to make an appointment with a pain management doctor closer to home to help relieve the post-injury pain.  (R. 475.)  She was also prescribed Percocet for pain.  (R. 497.)

Plaintiff began seeing Thomas W. Hanlon, M.D., of Pain Care Consultants in May 2008.  (R. 620.)  At the time, Plaintiff described severe pain in the left foot with radiation to the left knee and associated numbness and burning sensation.  (*Id.*)  Dr. Hanlon diagnosed left foot neuropathic pain, and left foot pain secondary to electrical burn.  (R. 621.)  In June 2008 Dr. Hanlon increased pain medication and in August he planned to schedule a left lumbar sympathetic block to address Plaintiff's continuing pain.  (R. 618, 619.)  Physical examination in August showed that sensation was positive for allodynia in the left foot, and the foot demonstrated color change, edema, hyperhidrosis, and antidromic radiation of pain up the leg on the left side.  (R. 618.)

On May 4, 2009, Plaintiff continued to report pain despite oral analgesics and a single lumbar sympathetic block. (R. 614.) She was scheduled to have another block at the office visit.  (*Id.*)

4

On June 24, 2009, Dr. Hanlon noted that examination showed that neurologically Plaintiff was still having severe pain in the left lower extremity with left foot pain and severe problems with ambulation secondary to the lower extremity problems. (R. 613.) Dr. Hanlon commented that, although motor was 5/5, there was some weakness developing in the left lower extremity secondary to lack of use, sensation was grossly intact to light touch with the exception of the hyperesthesia over the left foot, and deep tendon reflexes remained absent at the left ankle. (R. 613.)

In July 2009, Dr. Hanlon recorded that there was no rush to proceed with a possible spinal cord stimulator trial in that Plaintiff was fairly well controlled on her analgesic regimen. (R. 612.) In September Plaintiff reported fair pain control. (R. 611.)

At her January 14, 2010, visit with Dr. Hanlon, Plaintiff complained of increased pain antidromically radiating back to the hip which Dr. Hanlon noted was consistent with reflex sympathy dystrophy. (R. 610.) He also noted that cold weather had resulted in exacerbation of Plaintiff's pain. (*Id.*) Examination showed limited range of motion about the ankle secondary to pain, the foot was cold, somewhat cyanotic and hypersensitive to touch, sensation was intact except for the left foot, and deep tendon reflexes were symmetric though not obtainable on the left ankle. (*Id.*)

In April 2010, Plaintiff reported that pain increased with

weight-bearing and she had moderate relief with her current medication. (R. 608.) Dr. Hanlon's musculoskeletal exam was normal (including a normal gait) except for left foot allodynia and 1+ edema. (R. 609.) In August, Plaintiff complained of more hip pain which Dr. Hanlon noted to be "secondary to gait changes secondary to RSD." (R. 606.) Plaintiff also said she had less relief with Oxycodone. (*Id.*) No abnormal musculoskeletal or neurological findings were recorded. (R. 607.)

In May 2011, Dr. Hanlon noted that Plaintiff had failed lumbar sympathetic block, she remained on chronic opioid medication, and she was never able to attend physical therapy due to the severity of her pain. (R. 600.) In June Plaintiff complained of low back pain radiating to the left hip as well as radicular left leg pain and numbness in the left foot with symptoms worsening with walking. (R. 598.) Follow-up MRI of the lumbar spine showed mild disc bulging diffusely within the lumbar spine, and mild left foraminal narrowing at L4-5 and L5-S1. (R. 622.)

At her September 22, 2011, office visit, Plaintiff reported radiating left foot and leg pain with cramping in the left foot. (R. 596.) Plaintiff described the pain as severe, throbbing, aching, and burning with associated symptoms of numbness, foreign body sensation, and swelling. (*Id.*) She also said the pain increased with weight-bearing. (*Id.*)

On January 27, 2012, Plaintiff was seen by Paul Horchos, D.O.,

of Northeastern Rehabilitation Associates.  (R. 704-06.)  Dr.

Horchos noted that Plaintiff's neuropathic pain had intensified and

appeared "to be moving proximally in the leg running up to the

medial aspect of the foreleg and knee and then diagonal pattern

across the knee to the lateral aspect of the left thigh."  (R.

704.) Physical examination findings included the following:

> Her ambulation is very abnormal.  She has
> highly antalgic gait.  She walks with her
> left leg out to the side and kind of lagging
> behind.   She leans heavily on a cane to try
> to take weight off her left leg.  She does
> not have a normal heel strike.  She does not
> have a normal roll over with her left leg.
> Her left foot is cool to the touch but no[t]
> ischemic. . . . She does have
> hypersensitivity of the dorsum of the foot
> and has dysthesias of the sole of the foot.
> On the sole of her foot she states it feels
> like I am slicing her with a razor blade and
> on the dorsum of the foot she states it feels
> as though it's pins and needles.  Her ability
> to move her left ankle and left toes is
> intact but impaired when compared to the
> other side. . . . Knee and hip range of
> motion are within normal limits when she's
> seated, but when she stands she tends to hold
> them kind of in a stiff and lightly bent
> pattern.

(R. 705.)  Dr. Horchos's impression was reflex sympathetic

distrophy involving the left lower extremity with some proximal

progression.  (*Id.*)  He noted that sympathetic ganglion blocks were

the mainstay for treatment of reflex sympathetic dystrophy but they

did not provide Plaintiff with much relief.  (R. 706.)  He

recommended physical therapy and acupuncture.  (*Id.*)

On January 31, 2012, Dr. Hanlon noted that Plaintiff presented

with low back pain related to her chronic left foot pain, RSD secondary to electrical burn/injury, and subsequent neuropathic pain and gait disturbance. (R. 590.) He reported that sharp pain in the left knee with ambulation was consistent with gait disturbance from RSD of the left foot. (*Id.*) Dr. Hanlon noted that Plaintiff "most assuredly has opioid tolerance" and pain continued to trouble her although he had little to offer other than spinal cord stimulator. (R. 592.)

On April 20, 2012, Dr. Hanlon recorded that Plaintiff remained on oral opioids and her pain was not completely controlled but was acceptable. (R. 588.) He added that Plaintiff had severe pain with ambulation and she used a cane as an ambulatory assist. (R. 588.) Dr. Hanlon found decreased range of motion of the left foot and ankle, 1+ edema, slight erythema, and sensory intact excpet marked allodynia in the left foot. (*Id.*)

At her August 9, 2012, visit with Dr. Hanlon, Plaintiff expressed her desire to attempt to wean her opioid medication. (R. 587.)

Plaintiff had a consultative examination with Sandra Pascal, D.O., on March 24, 2013. (R. 680.) Plaintiff reported that she had been on opioids for five years but she was not getting any relief and had recently weaned off oxycodone. (*Id.*) She rated her pain at 8/10 at the time of the visit. (*Id.*) On general physical examination, Dr. Pascal noted that Plaintiff demonstrated pain

behaviors as she ambulated and she ambulated independently with a cane in her hand. (R. 681.) Examination of the spine showed a limited range of motion of the lumbar spine in flexion. (R. 682.) Examination of the extremities showed that Plaintiff had a limited range of motion of the left hip, no range of motion of the left hip in backward extension, difficulty moving her toes, and her left foot was mainly in eversion. (R. 682.) Neurological examination findings included

> positive left straight leg raise. She had decreased strength of the left lower extremity. She had an antalgic gait and was dependent on the right lower extremity. She had difficulty lifting her leg in order to walk without the cane. She was unable to do toes, heels, or tandem walking. She had decreased sensation and numbness of the left leg upon palpation. Deep tendon reflex of the left patella was 3+. The claimant can walk only about 10 feet without her cane, but please note as she is walking, she is imbalanced and almost falls on occasion. The cane is medically necessary.

(R. 682.)

## B. *Opinion Evidence*

### 1. <u>Examining Consultant</u>

Dr. Pascal completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) on March 24, 2013. (R. 685-90.) She opined that Plaintiff could frequently lift and carry all weights (R. 685); she could sit for eight hours at one time without interruption and for a total of eight hours during a work day (R. 686); and she could stand and walk for fifteen minutes each without

9

interruption and for a total in an eight-hour workday (*id.*).  Dr. Pascal found that Plaintiff required the use of a cane to ambulate, she could walk for ten feet without it, the cane was medically necessary, and she could not use the free hand to carry small objects because she needed that hand for balance.  (R. 686.)  Dr. Pascal did not find that Plaintiff was limited in the use of her hands and she did not have limitation in the use of her right foot but could only occasionally use her left foot for the operation of foot controls.  (R. 687.)  Regarding postural activities, Dr. Pascal concluded that Plaintiff could never climb ladders or scaffolds, balance or stoop, and she could occasionally climb stairs and ramps, kneel, crouch, and crawl.  (R. 688.)  Dr. Pascal indicated that Plaintiff could not walk a block at a reasonable pace on rough or uneven surfaces, she could not use standard public transportation, and she could not climb a few steps at a reasonable pace with the use of a single hand rail.  (R. 690.)  Finally, Dr. Pascal opined that the limitations identified had lasted or would last for twelve consecutive months.  (*Id.*)

## 2. **Reviewing Consultant**

On April 18, 2013, State agency physician Minda Bermudez, M.D., reviewed records and completed a Physical Residual Functional Capacity Assessment.  (R. 115-18.)  Dr. Bermudez opined that Plaintiff could lift twenty pounds occasionally and ten pounds frequently, she could stand and/or walk for four hours, a medically

required hand-held assistive device was necessary for ambulation, she could sit for about six hours in an eight-hour workday, she was to avoid left foot controls and repetitive motion, and she had postural and environmental limitations. (R. 116-17.) Dr. Bermudez noted diagnoses of severe Dysfunction of Major Joint, severe disorder of Automic Nervous System, and severe obesity. (R. 117.)

## C. *Hearing Testimony*

When asked about her physical problems at the August 25, 2014, ALJ hearing, Plaintiff talked about the pain in her left leg, stating that she had it daily, it got worse with activity, and the pain radiated to her hip. (R. 69-70.) Plaintiff said she had good days and bad days and she had more than one bad day a week, sometimes four in a row, where she stayed in bed or on the couch and she had someone come to her house to take care of her young daughter. (R. 71.) She said she had been on opioid medications for over five years and stopped taking them because she had trouble with them. (R. 66.) At that time she was not seeing a medical doctor for her physical problems because the only thing they had to offer was pain medication which she could not take. (R. 77.) However, she was taking Xanax, Trazadone for sleep, and Effexor for depression. (R. 67.) Describing her mental difficulties, Plaintiff said she was always nervous and scared, she had nightmares, and she had problems related to electricity. (R. 67-68.)

Plaintiff testified that she used a cane almost all the time but at home she was able to walk about five feet on a good day without it and on a bad day she still sometimes used a walker. (R. 71-72.) Plaintiff explained her balance problem in terms of lack of awareness of pressure she was putting on her leg so there was no stability. (R. 72.) Plaintiff also said she had to shift positions every five or six minutes when sitting because it felt like blood flow was being cut off. (*Id.*)

Regarding daily activities, Plaintiff said that she needed help with bathing on very bad days and she had made adjustments to assist her independence. (R. 73.) Plaintiff stated that she did some laundry-related chores using a chair, she did some grocery shopping using the cart as a walker and she does not get anything heavy. (R. 74-75.) Plaintiff testified that she was very active and athletic before she was burned and she no longer participates in activities. (R. 76.) Plaintiff explained that she was able to drive with difficulty and sometimes she had to pull over because she could not sit for too long. (*Id.*) In summary, Plaintiff described her life before the burn: she was working full time and had been since she was sixteen, she was going to school, doing her clinical rotations, raising her son and she had a new baby. (R. 80.)

The December 2, 2014, ALJ hearing focused on vocational issues. (*See* R. 84-93.) However, at the end of the hearing,

Plaintiff's attorney asked her whether her limitations had changed since the previous hearing. (R. 93.) Plaintiff responded that the cold weather made things much worse. (*Id.*)

At the August 22, 2016, hearing, Plaintiff testified that the problems with her leg had stayed the same since December 2014 but she had a very hard time with anxiety the previous year. (R. 99.) A Vocational Expert ("VE") again testified and the ALJ confirmed that Plaintiff was unable to do her past relevant work. (R. 100-01.) However, the VE testified that a hypothetical person of Plaintiff's age, education, and work experience with numerous identified limitations would be able to perform exemplary sedentary jobs. (R. 100-03.)

## D. *ALJ Decision*

In her August 30, 2016, Decision, ALJ Koennecke determined that Plaintiff had the severe impairments of reflex sympathetic dystrophy with nerve damage of the left lower extremity and a mental impairment. (R. 43.) The ALJ found that numerous other conditions were not severe within the meaning of the regulations but the limiting effects of all impairments were considered in determining Plaintiff's residual functional capacity ("RFC"). (*Id.*) ALJ Koennecke concluded Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. (*Id.*) Regarding physical impairments she stated that

13

> [a]lthough reflex sympathetic dystrophy with
> nerve damage of the left lower extremity was
> considered to be a severe impairment through
> the date last insured, this condition was not
> attended with the specific clinical signs and
> diagnostic findings required to meet or equal
> any of the requirements in the
> musculoskeletal and neurological listings set
> forth at Sections 1.00 *et. seq.* and 11.00 *et.
> seq.* The evidence in the record shows that
> the claimant was capable of sustaining a
> reasonable walking pace over a sufficient
> distance because she was able to carry out
> her activities of daily living, as discussed
> in greater detail below.

(R. 44.)

The ALJ determined that Plaintiff had the residual functional

capacity ("RFC") to perform sedentary work

> because the claimant was able to lift and/or
> carry any amount of weight frequently, stand
> and/or walk for a combined total of thirty
> minutes in an eight-hour workday with the
> assistance of a cane for balance, and sit for
> eight hours in an eight-hour workday. The
> claimant was able to use her upper
> extremities to continuously reach, handle,
> finger, feel, push, and pull. The claimant
> was able to use her right lower extremity to
> operate foot controls continuously, and she
> was able to use her left lower extremity to
> operate foot controls occasionally. The
> claimant was unable to balance, stoop, and
> climb ladders or scaffolds, but she was able
> to occasionally kneel, crouch, crawl, and
> climb stairs and ramps. The claimant was
> unable to tolerate exposure to unprotected
> heights, but she was able to tolerate
> occasional exposure to moving mechanical
> parts, operation of a motor vehicle, humidity
> and wetness, respiratory irritants including
> dust, odors, and fumes, extreme heat and
> cold, and vibrations. The claimant was able
> to tolerate exposure to moderate noise
> levels, such as the noise levels in an

office.  The claimant was unable to walk a
block at a reasonable pace on rough or uneven
surfaces, use public transportation, and
climb a few steps at a reasonable pace with
the use of a single handrail.  Additionally,
the claimant retained the ability to
understand and follow simple instructions and
directions, perform simple tasks with
supervision and independently maintain
attention and concentration for tasks,
regularly attend to a routine and maintain a
schedule, and relate to and interact
appropriately with others in order to carry
out simple, repetitive tasks.  The claimant
was able to handle work-related stress
because she was able to engage in work that
requires occasional decision-making related
to the performance of simple tasks involving
goal-oriented work rather than work involving
a production-rate pace.  The claimant needed
to engage in work that did not require her to
supervise or manage the work of others, and
she needed to avoid work that required more
complex interaction or joint efforts to
achieve work goals.

(R. 44-46.)

ALJ Koennecke assigned great weight to the opinions of Dr.

Pascal "due to her programmatic expertise, her physical examination

of the claimant, and the consistency of her opinions with the

longitudinal medical evidence in the record."  (R. 49 (citing Ex.

6F [R. 680-90]).)  The ALJ assigned significant weight to the

opinion of Dr. Bermudez and mental health sources based on

"programmatic expertise and the relative consistency of their

opinions with the overall medical evidence, including the

claimant's conservative history and GAF scores."[2]  (R. 49 (citing
Exs. 1A and 7F [R. 108-22, 691-98]).)

The ALJ further found that Plaintiff was unable to perform any
past relevant work but she was capable of performing jobs that
existed in significant numbers in the national economy.  (R. 50.)
ALJ Koennecke therefore concluded that Plaintiff had not been under
a disability as defined in the Social Security Act through
September 30, 2013, the date last insured.  (R. 52.)

Other relevant portions of the ALJ's Decision will be
referenced in the Discussion section of this Memorandum.

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to
determine whether a claimant is disabled.[3]  It is necessary for the

_____

[2]  ALJ Koennecke did not substantively review the opinion of
Dr. Bermudez in her RFC explanation.  (*See* R. 46-50.)

[3]  "Disability" is defined as the "inability to engage in any
substantial gainful activity by reason of any medically
determinable physical or mental impairment which can be expected to
result in death or which has lasted or can be expected to last for
a continuous period of not less than 12 months . . . ."  42 U.S.C.
§ 423(d)(1)(A).  The Act further provides that an individual is
disabled

> only if his physical or mental impairment or
> impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work
> experience, engage in any other kind of
> substantial gainful work which exists in the
> national economy, regardless of whether such
> work exists in the immediate area in which he
> lives, or whether a specific job vacancy exists
> for him, or whether he would be hired if he

16

Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work. 20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record. 20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process. *Id.*

The disability determination involves shifting burdens of proof. The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work. If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience

applied for work.
42 U.S.C. § 423(d)(2)(A).

17

can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at step five of the sequential evaluation process when the ALJ found that Plaintiff could perform jobs that existed in significant numbers in the national economy.  (R. 50.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence— particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion.  *See* [*Cotter*, 642 F.2d] at 706

18

> ("'Substantial evidence' can only be
> considered as supporting evidence in
> relationship to all the other evidence in the
> record.") (footnote omitted). The search for
> substantial evidence is thus a qualitative
> exercise without which our review of social
> security disability cases ceases to be merely
> deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the ALJ to analyze all probative evidence and set out the reasons for his decision. *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119-20 (3d Cir. 2000) (citations omitted). If he has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979). In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07. However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).

19

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ."). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where a claimed error would not affect the outcome of a case, remand is not required. *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005). Finally, an ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

In her supporting brief, Plaintiff asserts generally that the ALJ committed reversible error in finding there was insufficient evidence to establish Plaintiff could not engage in substantial gainful activity. (Doc. 10 at 7.) After referencing her hearing testimony, her written application, and her husband's Third Party Function Report, Plaintiff states that "[a]ny attempt by the

Administrative Law Judge to discredit Ms. Bidwell's testimony as inconsistent falls short of the proper exercise of discretionary authority. The Administrative Law Judge abused her discretionary authority." (Doc. 10 at 8 (citing R. 374-381, 396-403).) Plaintiff next specifically avers that the ALJ committed reversible error by not following the sequential evaluation process in that she did not specifically consider the requirements for Listing 1.08. (Doc. 10 at 8-10.) Plaintiff then states that she has satisfied her burden of showing that she has a severe medical impairment that severely limits her functional abilities, generally pointing to her testimony and that of her husband, medical evidence, and vocational witness testimony as support for her conclusion that the ALJ improperly determined her RFC. (R. 11.) Plaintiff also finds fault with the ALJ's comments about Plaintiff's use of a cane (*id.* at 11-12), and contends that the ALJ demonstrated a predisposition to deny Plaintiff's claim (*id.* at 12). Plaintiff points to an exchange at the August 2016 hearing regarding information the Vocational Expert had reviewed as evidence that the ALJ demonstrated bias generally (Doc. 10 at 12 (citing R. 91-92)), and she states, after referencing credibility considerations, that no evidence supports the ALJ's findings (*id.* at 12).

Of these alleged errors, only the assertion regarding the ALJ's listing determination is presented in more than conclusory

terms. (*See* Doc. 10 at 10-12.) The remaining assertions are not supported by analysis and/or citation adequate to warrant further consideration. (*See* Doc. 10 at 8-12.) Therefore, the Court's discussion will address only the claimed listing error which points to error at step three of the sequential evaluation process.

Plaintiff asserts that the ALJ's step three error is two-fold: she erred in finding that Plaintiff did not satisfy Listing 1.08 and the ALJ's failure to address the listing constitutes reversible error. (Doc. 10 t 10.) As set out in the Background section above, ALJ Koennecke stated that

> [a]lthough reflex sympathetic dystrophy with nerve damage of the left lower extremity was considered to be a severe impairment through the date last insured, this condition was not attended with the specific clinical signs and diagnostic findings required to meet or equal any of the requirements in the musculoskeletal and neurological listings set forth at Sections 1.00 *et. seq.* and 11.00 *et. seq.* The evidence in the record shows that the claimant was capable of sustaining a reasonable walking pace over a sufficient distance because she was able to carry out her activities of daily living, as discussed in greater detail below.

(R. 44.)

The quoted material is the sum of the ALJ's discussion of physical impairments at step three. (*See* R. 44-45.) The Court finds the determination problematic for several reasons. While ALJ Koennecke broadly referenced listing sections, she did not specifically discuss any listing, including Listing 1.08 which

22

addresses soft tissue injuries like burns.  Insofar as Dr.
Bermudez, whose opinion was not specifically reviewed but was
assigned significant weight (R. 48-49), also found Plaintiff to
have a severe Dysfunction of Major Joint (R. 117, 118) which
corresponds with Listing 1.02, substantial evidence necessary to
support the ALJ's step three determination should include "the
specific clinical signs and diagnostic findings" which were found
lacking regarding these listings and others considered potentially
relevant at "Sections 1.00 *et seq.* and 11.00 *et seq.*"  (R. 44.)

Plaintiff's broad-brush approach to referencing evidence which
she infers supports a favorable step three finding (*see* Doc. 10 at
8-10) does not present a strong argument supporting that the
claimed error requires reversal or remand.  However, given the
remedial nature of the statute, *see Dobrowolsky*, 606 F.2d at 406,
the Court concludes further step three evaluation is warranted
here.  In addition to the lack of specificity in the ALJ's reason
for rejecting the listing categories cited above, her statement
regarding Plaintiff's walking capability (R. 44) does not comport
with her later findings or record evidence to which she assigned
great weight.[4]  Dr. Pascal found that Plaintiff could not walk a

---

[4]  This Court's focus on functional limitations follows the
ALJ's step three rationale and Defendant's step three argument
(Doc. 11 at 24-27).  It is not meant to indicate that the Court
finds that other listing requirements are met.  Satisfaction of
specific listing requirements is to be considered on remand.  In
this process, the ALJ is to  consider not only whether Plaintiff
meets a listing requirement but also whether her impairments meet

block at a reasonable pace on rough or uneven surfaces, she could not use standard public transportation, and she could not climb a few steps at a reasonable pace with the use of a single hand rail (R. 690), limitations which the ALJ incorporated into Plaintiff's RFC (R. 46).  The identified limitations relate to listing requirements regarding functional limitations relevant to ambulation.  For example, Listing 1.08 addresses a soft tissue injury where "a major function was not restored or expected to be restored within 12 months of onset," see 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.08, and functional loss for purpose of the listings includes the inability to ambulate effectively on a sustained basis, 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02B2(a).  Similarly, Listing 1.02 addresses Major Dysfunction of Joints and considers the inability to ambulate effectively.  See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02.  Section 1.00B2b explains what is meant by ineffective ambulation and provides as follows:

> b.  What we mean by inability to ambulate effectively.
>
> (1) Definition.  Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held

---

the medical equivalency requirements of 20 C.F.R. § 404.1526.

24

assistive device(s) that limits the
functioning of both upper extremities.
(Listing 1.05C is an exception to this
general definition because the individual has
the use of only one upper extremity due to
amputation of a hand.)

(2) To ambulate effectively, individuals must
be capable of sustaining a reasonable walking
pace over a sufficient distance to be able to
carry out activities of daily living.  They
must have the ability to travel without
companion assistance to and from a place of
employment or school.  Therefore, examples of
ineffective ambulation include, but are not
limited to, the inability to walk without the
use of a walker, two crutches or two canes,
the inability to walk a block at a reasonable
pace on rough or uneven surfaces, the
inability to use standard public
transportation, the inability to carry out
routine ambulatory activities, such as
shopping and banking, and the inability to
climb a few steps at a reasonable pace with
the use of a single hand rail.  The ability
to walk independently about one's home
without the use of assistive devices does
not, in and of itself, constitute effective
ambulation.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2b.

Defendant argues "[a]ssuming Plaintiff's left lower extremity

injury qualified as a requisite soft tissue injury under the

Listing, Plaintiff fails to meet this Listing as she fails to show

that she had ineffective ambulation as defined in 20 C.F.R. Pt.

404, Subpt. P, App. 1, § 1.00(B)(2)(1)."  (Doc. 11 at 26.)

Defendant continues with the assertion that "[i]neffective

ambulation is defined as 'insufficient lower extremity functioning

. . . to permit independent ambulation without the use of a

handheld assistive device(s) that limits the functioning of both upper extremities.'" (Doc. 11 at 26 (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(1)).)

This argument reflects ALJ Koennecke's step three finding that Plaintiff was capable of sustaining a reasonable walking pace over a sufficient distance. (*See* R. 44.) Both arguments fail for similar reasons: they rely on Plaintiff's ability to carry out some activities of daily living without assessing her identified limitations which are consistent with finding that she was unable to ambulate effectively. Dr. Pascal and the ALJ found that Plaintiff could not walk a block at a reasonable pace on rough or uneven surfaces, she could not use standard public transportation, and she could not climb a few steps at a reasonable pace with the use of a single hand rail. (R. 46, 690.) These are *specific* examples of *ineffective* ambulation set out in 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2b(2).[5] Nothing in § 1.00B2b(2) requires

---

[5] Further, arguably Plaintiff's use of a cane limits the functioning of both upper extremities in that Dr. Pascal emphasized that Plaintiff needed her free hand for balance while walking with a cane. (*See* R. 686.)

The Court further notes that Defendant's citation to findings of a normal gait upon examination is not as supportive of lack of ineffective ambulation as Defendant suggests (*see* Doc. 11 at 27 (citations omitted)) in that while Dr. Hanlon often reported that Plaintiff had a normal gait in his musculoskeletal physical examination findings, (*see* Doc. 11 at 6-7 (citing R. 591, 594, 597, 599-601, 603, 605, 607, 609)), at times he also found gait disturbance and, at some visits *both* gait disturbance and normal gait were recorded (*see*, *e.g.*, R. 590-91, 606-07).

that *all* examples of ineffective ambulation must be met.

On this record, the Court cannot conclude the ALJ's step three determination is supported by substantial evidence. Therefore, remand is required for further consideration which, at the very least, must address the fact that the ALJ acknowledges limitations consistent with an inability to ambulate effectively. The analysis must incorporate a resolution of the apparent conflict between the acceptance of these limitations and the finding that Plaintiff has not shown that she had ineffective ambulation (*see* R. 44, Doc. 11 at 26).

## V. Conclusion

For the reasons discussed above, Plaintiff's appeal is properly granted. The Acting Commissioner's decision is reversed and this matter is remanded for further consideration. An appropriate Order is filed simultaneously with this Memorandum.

S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

DATED: December 11, 2017